```
 1                 UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF KENTUCKY
 2                      LEXINGTON DIVISION

 3  UNITED STATES OF AMERICA,      . Docket No. CR 09-181-S

 4        Plaintiff,               . Lexington, Kentucky
                                   . May 24, 2010
 5           v.                    . 1:35 p.m.
                                   .
 6  BRYAN COFFMAN,                 . Arraignment/Motion
                                   .      Hearing
 7  MEGAN COFFMAN,                 .
                                   .
 8  VADIM TSATSKIN,                .
    aka VICTOR TSATSKIN,           .
 9                                 .
    GARY MILBY,                    .
10                                 .
          Defendants.             .
11  . . . . . . . . . . . . . . .

12                 TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE JOSEPH M. HOOD
13              UNITED STATES DISTRICT JUDGE

14  APPEARANCES:

15  For the Plaintiff:    Mr. Ken Taylor
                          Assistant United States Attorney
16                        260 West Vine Street, Suite 300
                          Lexington, KY 40507-1671
17
                          Ms. Eva Christine Lewis
18
    For the Defendants:   Mr. Steven Rush Romines
19  Bryan Coffman         Romines, Weis & Young, PSC
                          600 W. Main St.
20                        Suite 100
                          Louisville, KY 40202
21
    Megan Coffman         Mr. Patrick J. Renn
22                        600 W. Main St.
                          Suite 100
23                        Louisville, KY 40202

24

25
```

```
 1  APPEARANCES (Continued):

 2  For the Defendants:   Mr. R. Michael Murphy
    Gary Milby             Law Office of R. Michael Murphy,
 3                            PLLC
                           709 Mill Pond Road
 4                         Lexington, KY 40514

 5  Court Reporter:       K. Ann Banta, RPR, CRR
                           101 Barr
 6                         Lexington, KY 40507
                           (502) 545-1090
 7
    Proceedings recorded by mechanical stenography,
 8  transcript produced by computer-aided transcription.

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        Monday afternoon session,
 2                        May 24, 2010, 1:35 p.m.
 3                        - - -
 4          THE COURT:  Madam Clerk, call the matter on,
 5  please.
 6          THE CLERK:  Yes, Your Honor, Lexington
 7  criminal no. 09-181-S, United States of America v.
 8  Bryan Coffman, Megan Coffman and Gary Milby, called
 9  for arraignment on the superseding indictment and
10  hearing on motion.
11          THE COURT:  All right.  Mr. Romines?
12          MR. ROMINES:  Good morning, Your Honor.  Or
13  afternoon, I guess.
14          THE COURT:  Good morning.  You people from
15  Louisville look very sharp.
16          MR. ROMINES:  And I am one of the sharpest
17  ones too, Judge, I like to say.
18          THE COURT:  That's what I am told.  I am told
19  you are a legend in your own mind.
20          MR. ROMINES:  That's exactly right.
21          THE COURT:  Mr. Renn?
22          MR. RENN:  I am dull as a circle.  But yes, I
23  understand it's the afternoon.  Good afternoon to you.
24          THE COURT:  And Mr. Murphy?
25          MR. MURPHY:  Good afternoon, Your Honor, it's
```

1  always a pleasure to be in court with you.

2          I would like to ask permission to use the

3  table that's normally reserved for the probation

4  office, if I might.

5          THE COURT:  It might ruin their reputation,

6  but you have my permission.

7          MR. MURPHY:  All right, thank you.

8          THE COURT:  We have very little room in this

9  courtroom.

10          MR. MURPHY:  By the way, my client is here.

11  He is in the back of the courtroom.

12          THE COURT:  I figured they all were.  Big

13  motion we scheduled was the government's motion for

14  leave to take the deposition of Mr. Chase.

15          Mr. Taylor?

16          MR. TAYLOR:  Yes, Your Honor, I -- I'll just

17  basically supplement what I have said in -- in writing

18  and summarize it.

19          And it is that we have a witness that's

20  beyond the subpoena power of the court who has

21  expressed some reluctance to come here initially.

22          And only when we started the MLAT procedure

23  and the handwriting was on the wall that we weren't

24  going to go away did he become compliant and did he

25  express a willingness to come to the United States.

 1          But he still has reservations, you can tell

 2    if you have read the emails, his attorney's concerned

 3    about other jurisdictions might pick him up on

 4    something.

 5          And so I have got to assure him, something

 6    akin to free passage, and I am working on that.

 7          I have tried to cross the country to solicit

 8    anybody who's got any objections to me giving this guy

 9    immunity.

10          And I have already gotten from the United

11    States Department of Justice Tax Division that, "You

12    shall not immunize him from any tax violation even

13    arising from this case, you can't do it."

14          And so I am going to have to exclude taxes

15    from my letter saying we won't prosecute you.

16          Now, I will say I don't think tax is going to

17    prosecute you, but they want to reserve the right to

18    do that.

19          That can clear this deal, to be blunt.  His

20    willingness to come here may evaporate yet.

21          So what we would like to do, Your Honor, is

22    sort of like a provisional T-shot in golf.

23          THE COURT:  I wouldn't know anything about

24    that.

25          MR. TAYLOR:  You never hit one out of

1  bounds?

2          THE COURT:  I don't hit one far enough.

3          MR. TAYLOR:  But we want something to fall

4  back on.  We want to force the issue early.

5          If he is not coming, we want to know it now,

6  and then we can go back to the MLAT procedure and come

7  back to you and say let us go down there.

8          We are not going to disband the MLAT

9  procedure.  We are going to leave it in place right

10  now.

11          Everybody's calming down now.  We are not

12  going to go through with it just right now.

13          But if we send him an airline ticket and a

14  notice of a deposition, and he is a no show within the

15  next month or so, whenever we schedule this thing, we

16  will know he is not serious about coming and we will

17  have the opportunity to revive the MLAT procedure and

18  hopefully retain the September trial date.

19          THE COURT:  Well, then that -- then that kind

20  of begs the question, what if he -- why do you need to

21  take the deposition if he can come to trial?

22          MR. TAYLOR:  Well, that's just the point.  We

23  hope he will come, we believe he will come --

24          THE COURT:  To trial.

25          MR. TAYLOR:  -- to trial.  And if he does

1  come, if we take the deposition and he does come, we

2  use his trial testimony.  We don't use the

3  deposition.

4          We don't play the provisional ball, and so we

5  pick it up.

6          THE COURT:  Okay.

7          MR. TAYLOR:  And it can be used in cross

8  examination.  It is a prior statement.

9          And this actually inures to the benefit of

10 the defense in terms of getting a preview of what this

11 guy is going to say.

12          In most instances, you would think they would

13 love a shot at one of the witnesses to find out what

14 he is going to say, exactly how credible he is going

15 to be.

16          THE COURT:  You used that term -- a chance to

17 cross examine would be a little better, wouldn't it?

18          MR. TAYLOR:  Yes.

19          THE COURT:  As opposed to a shot at him.

20          MR. TAYLOR:  That's correct.  Not shot at.

21 That probably was -- well, in a white collar case,

22 that's not such a bad term.

23          THE COURT:  Well, may not be.

24          MR. TAYLOR:  I will point out, interestingly

25 one of the cases they cite, U.S. v. Ramos seems to

1 address this very situation.

2          It says, "In determining what is prospective

3 unavailability," it says, "a substantial likelihood of

4 unavailability can be found when the proposed deponent

5 is beyond the subpoena powers of the United States and

6 has declared his unwillingness to testify at trial or

7 even having declared willingness to testify cannot be

8 subpoenaed if he changes his mind."

9          And that's what we have got here.  We have

10 got an individual who could change his mind, and there

11 is reason to believe he might.

12          This guy, you have got to keep in mind, he

13 operates in a grey area.

14          And he sets up shell corporations for a

15 living, and he will put himself on the paperwork as

16 the president.

17          And then he sees no evil, and he has

18 plausible deniability if -- with regard to what they

19 are doing with this shell corporation.

20          But he has to know that he is on the fringes

21 many times.

22          I mean, there could be some legitimate

23 reasons for a shell corporation.

24          But he has to know there are a lot of

25 illegitimate ones, too.

1              And his name probably has come up in other
2   cases across the country, and so he is a nervous Nelly
3   sometimes.
4              He was initially when we interviewed him.  He
5   would submit to the interview, but he didn't want to
6   cooperate much beyond that.
7              When we started the MLAT, he suddenly got on
8   board.
9              So we are concerned that if the MLAT goes
10  away and he doesn't have to come to a deposition, we
11  are at his mercy in September when we try to put him
12  on a plane.
13             So we think we have established his
14  materiality.
15             Okay, yeah, I need to cite that case for the
16  record.  Ramos is 45 F. 3d, 1519, 11th Circuit, 1995.
17             We must establish materiality with emails. In
18  there you can see he is saying they have lied.
19             We sent him the documents that they used his
20  name on.
21             And he basically said, "That's a big lie,
22  that's not -- I don't do that."
23             And we need to be able to refute that, and we
24  have established prospective unavailability.
25             And really there is no prejudice to the

1 defendants whatsoever, especially if the deposition is

2 in the United States.

3          The only reason they are opposed to the

4 deposition is they don't want his testimony to come

5 before the jury ultimately, that's the only reason.

6          And -- and in that regard, and they are not

7 losing any cross examination rights, they are losing

8 nothing by taking the deposition, especially if he

9 shows at trial.

10          THE COURT:  All right.

11          Mr. Romines?

12          MR. ROMINES:  Yes, Your Honor.  Judge, first

13 of all, I would take exception to Mr. Taylor's

14 justifying my only reasons for him wanting to testify

15 before the trial is I don't want his testimony coming

16 before the trial.

17          I am more than happy for them to put him

18 before the jury.

19          And that's what we are requesting here is

20 when trials are conducted -- the court's conducted

21 many -- that you don't get a trial run when you put

22 your proof on.

23          You put them on and, you know, what the jury

24 hears is what they get.

25          That's basically what they are asking for,

1  you know, they want to, you know, take a mulligan

2  every time.

3           Well, you are not allowed to do that, since

4  we are using the golf parlance.

5           Provisionals, you have to take the penalty,

6  as the court is well aware.  They don't get to do that

7  here.

8           What they have done is they have filed an

9  initial motion that said he is refusing to cooperate,

10 will not come; therefore, we need to take his

11 deposition.

12          When we objected, then they produced some

13 evidence that they have tried to get.

14          Because our initial objection was you have

15 made no showing under the rule that you have tried to

16 get him here.

17          After we object, then they make an effort to

18 contact him.

19          Judge, that is disingenuous to the point of

20 contemptuous almost in that they say he is not willing

21 to come, yet at that point there had been no effort to

22 contact him.

23          MR. TAYLOR:  That's not true.  Simply not

24 true.

25          MR. ROMINES:  Judge --

1          THE COURT:  Let him make his record, you have

2  got a chance to --

3          MR. ROMINES:  I am referring to what's in the

4  record.

5          The contact with Mr. Chase about appearing in

6  trial occurred two days after we object, after they

7  had filed their motion.

8          But initially, they say, "He won't come;

9  therefore, we need to depose him."

10         Now they are saying, "He will come, but we

11 still need to depose him."

12         THE COURT:  Well, there is no question that

13 he is out of the subpoena power.

14         MR. ROMINES:  He is out of the subpoena

15 power, I will concede that, Judge.

16         However, there is not one case that they can

17 cite, not one in which a definite Rule 15 deposition

18 has been allowed on a witness who has indicated he

19 will come to trial, not one.

20         They are all for witnesses who have advised

21 already they refuse to come.

22         THE COURT:  Okay, let me ask you this.

23 Suppose they say we are going to subpoena you to come

24 to trial.

25         Well, obviously that subpoena is not any good

1 because he is in the Bahamas I think it is?

2          MR. ROMINES:  Correct.

3          THE COURT:  So they are having to rely on his

4 good graces to come.

5          MR. ROMINES:  And the MLAT.

6          THE COURT:  And the what?

7          MR. ROMINES:  The Mutual Legal Assistance

8 Treaty, which his government is requesting him to

9 come.

10          THE COURT:  Yeah, well, he would have to

11 come.

12          MR. ROMINES:  Right.

13          THE COURT:  And then he would come, and --

14 what if he didn't come?  What would happen then?

15          MR. ROMINES:  Judge, it's no different than

16 any witness that you have difficulty finding.

17          That's a classic example, Mr. Renn and I were

18 discussing it, Your Honor.

19          We have got employees of the Global Energy

20 Group who live in Canada who probably don't want to

21 come down and testify in this trial.

22          THE COURT:  Well, if it was in November,

23 December, January or February, they would probably pay

24 to come down to this --

25          MR. ROMINES:  They might, Judge, but it's

1   hockey season also.

2          THE COURT:  It's basketball season, who cares
3   about hockey?

4          MR. ROMINES:  They do.  They do.

5          THE COURT:  Well, that's why they live up
6   there.

7          MR. ROMINES:  That's why they live up there
8   and we live here.

9          But are they allowed to depose every one of
10  those witnesses just because we think they might not
11  want to come?

12         There has got to be a showing that he will
13  not come.  They have got to make that showing.

14         The only showing they have made now is he
15  will come.

16         You can't have just, if we want, we are
17  allowed to do it.

18         THE COURT:  Okay, but then we get back to the
19  point, what happens in September, I think it is,
20  right?

21         Where we are all going to be excited, and
22  everybody will be here; and we are going to have a
23  trial.

24         And lo and behold, next thing, where is
25  Mr. Chase?  And they say, "He isn't coming."  So what

1  happens then?

2          MR. ROMINES:  Then they have to deal with

3  that problem at that time.  But they are not

4  allowed --

5          THE COURT:  No, the problem at that time will

6  be to say, "Well, Judge, let's just continue this

7  trial until we get him."

8          MR. ROMINES:  And that's something that they

9  can -- you know, we understand that's a possibility by

10 our objection.

11         But I would rather the trial be continued and

12 him be put before the jury than be playing

13 depositions.

14         And that's the risk that we are willing to

15 take.

16         But Your Honor, they are not allowed to use

17 Rule 15 depositions as a prophylactic measure in case

18 a witness don't show up.

19         They have got to make a showing that he won't

20 or a substantial likelihood that he won't.

21         And the evidence has been provided in this

22 case is the substantial likelihood is he will.

23         THE COURT:  Well, he said he would.

24         MR. ROMINES:  Right.

25         THE COURT:  He said he would come to the

1   United States to take his deposition.

2              MR. ROMINES:  And for trial.

3              THE COURT:  And for trial.

4              MR. ROMINES:  Right.  But every case, every

5   single case concerning these Rule 15 depositions are

6   where the witness has affirmatively advised that he

7   will refuse to appear, every single one of them.

8              There is never one.  They cannot cite one

9   single case in which a witness says, "I am going to

10  appear," but I want to take his deposition anyway just

11  in case.  That's not permitted by the rule, Judge.

12             THE COURT:  Okay, Mr. Renn?

13             MR. RENN:  Your Honor, I think everything's

14  been said or written that could be about this.

15             And I think the real issue is clearly the

16  government has said he's a critical witness, a

17  material witness.  And that may be true --

18             THE COURT:  And you all don't dispute that.

19             MR. RENN:  I don't dispute that as to Bryan

20  Coffman.

21             As to Megan Coffman, he is a material

22  witness.

23             He is not going to hurt me, he is not going

24  to help me.  So him coming and testifying --

25             THE COURT:  Then what are you griping about?

1          MR. RENN:  Your Honor, the thing that I was

2 griping about was initially the government filed a

3 motion and this court granted it that was going to

4 compel my client to leave this country and go down

5 into another country to take a deposition before

6 discovery --

7          THE COURT:  I wouldn't have compelled your

8 client to do anything.  She wouldn't have had to go.

9          MR. RENN:  She either goes down there under

10 the order of the court or she stays back here and

11 gives up very important rights, i.e., the Sixth

12 Amendment to confront that witness.

13          THE COURT:  You said he is not going to hurt

14 you one way or another.

15          MR. RENN:  Well, I don't believe he will,

16 let's say that, from what I have seen thus far.

17          And that's where we get into the potential

18 prejudice.

19          We haven't completed discovery.  I was just

20 given discovery here today.

21          So if we believe that this witness isn't

22 going to be hurtful to us, we take the deposition in

23 June, we take it in July.

24          And lo and behold, we get in the middle of

25 trial in September and this witness doesn't come back

1 to testify, although he's now agreed, and not only

2 will he come for a deposition, he's agreed that he is

3 going to come for trial testimony.

4          He's never indicated anything other than

5 that.

6          But if in fact he doesn't come back, well,

7 the government's got a deposition that they have now

8 found to be helpful.

9          So they don't have to try real hard to get

10 him here because they have got what they want.

11         Well, if this deposition testimony of this

12 material critical witness is conflicting with some

13 other witness, we don't have the opportunity to have

14 that witness come back and testify in our case.

15         And so that's the real harm, number one, is

16 we haven't completed discovery, so we are not sure

17 what's out there.

18         And if we only end up with a deposition, and

19 this witness's testimony is inconsistent with or other

20 witnesses are inconsistent with that testimony, we

21 have lost the opportunity to have that witness come

22 back on some kind of rebuttal and face those

23 inconsistencies.  All we would have then is the

24 depositions.

25         There is a prejudice here because we are

1  waiting for further ruling.

2          But if in fact the court would entertain this

3  motion and grant the motion of the government, there

4  would be some things we would like to see in place

5  before the deposition would occur in order that we

6  could prepare effectively for trial.

7          THE COURT:  All right.

8          Mr. Murphy?

9          MR. MURPHY:  I am neutral in this matter,

10  Your Honor.

11          I don't think this witness, if he tells the

12  truth, is going to be a hurtful witness against my

13  client.  In fact it might even be exculpatory.

14          My only concern is he is in the process of

15  trying to cut a deal in return for not being

16  prosecuted.

17          And people who do that, at least in my

18  previous four decades of doing this kind of work,

19  tells me that he is not without sin himself.

20          And that raises another concern on my part --

21  I don't think there is anything we can do about it

22  here today -- is that some people who make deals with

23  the government in exchange for testimony will say --

24  even without prompting by the government, will say

25  whatever they think the government wants them to say.

1              But again, there is no way to prevent that

2    from happening, and that's what cross examination is

3    about, so --

4              THE COURT:  All right.

5              MR. MURPHY:  I am neutral.

6              THE COURT:  Didn't sound like it.

7              Mr. Taylor?

8              MR. TAYLOR:  I have to correct some factual

9    representation by Mr. Romines.

10             He said we didn't attempt to contact

11   Mr. Arthur Chase until two days after they objected.

12             That is patently false.  It's in John

13   Spruill's affidavit.

14             He says that he interviewed Mr. Chase on

15   January 27, 2009, over a year ago.

16             And then he also states in here, and at the

17   end of that conversation he takes down some

18   information, and he reports back to me after that that

19   Mr. Chase was very nervous of the Bahamian

20   authorities, wanted to meet with him alone and didn't

21   want the Bahamian authorities listening in.

22             Some time later I got on the phone, and

23   that's in the affidavit with Mr. Spruill after the

24   January interview; and I talked to him about

25   cooperating in our investigation.

1          I have heard what you have said, it's

2   material evidence when you cooperate in our

3   investigation.

4          And while he didn't say emphatically no, he

5   didn't say yes.

6          He hemmed and hawed, I'll think about it,

7   call me later, da, da, da, da, da, da.

8          And so it was clear to me that the guy was --

9   was nervous about coming to the United States.

10          It was on that basis that we started running

11   the flag up about taking a foreign deposition.

12          And you will recall, when we were in court, I

13   don't know if it was the arraignment or what, I am

14   positive this prospect of taking a deposition, there

15   wasn't one objection to that.

16          There was this, well, we will think about

17   it.

18          But everyone seemed geared up, so when I made

19   the motion to go and do it, I did it in the context of

20   thinking there wasn't much of an objection.

21          Then suddenly we get all these formal

22   legalistic objections.

23          So then we backed up and put more information

24   into the record to justify doing it because we saw we

25   were going to have to fight the objections.

1          So our position evolves as we get additional

2   information and as we respond to their legal

3   positions.

4          There is nothing disingenuous, there is

5   nothing contemptuous, there is nothing dishonest about

6   what we have done.

7          In fact, we have proceeded with utmost good

8   faith.

9          Now, I will also point out that Mr. Romines

10  said there is no case law that says a person who says

11  they will come will be deposed.

12         Well, I haven't exhausted all the cases in

13  that regard.

14         But, again, I will repeat what Ramos says,

15  "Or even having declared willingness to testify cannot

16  be subpoenaed if he changes his mind."  And that's

17  what we have got here precisely.

18         And I would also point to the Johnson case.

19  It's a Sixth Circuit case.

20         And in Johnson, they had an overseas witness

21  who had some valuable information, but he didn't want

22  to come to the United States.

23         So the government decided instead of doing

24  the Rule 15 deposition, went to the court and said,

25  "Judge, they have agreed to a live feed video.  We can

1  -- the jury can see their demeanor, it's in real time,

2  it's in the flow of our trial, the defendants can

3  cross examine over video."

4         And that's what they did, went up on the

5  Sixth Circuit on the defendant's objection, and the

6  Sixth Circuit said, "You should have used a Rule 15

7  deposition because that's face to face.

8         A video across the ocean is not face to

9  face."

10        Now, most lay people would say the video is

11 better than the deposition which gets read in the

12 record months after it's taken.  But it's not --

13        THE COURT:  You are not going to get me to

14 say one bad thing about the Sixth Circuit.

15        I may not have -- I may have been born in the

16 dark, but it wasn't last night.

17        MR. TAYLOR:  But the Sixth Circuit got hooked

18 up on this Sixth Amendment face-to-face thing, and

19 said a Rule 15 where the defendants travel to Italy or

20 wherever it is is face to face even though it's been

21 transcribed and read into the record much later; so

22 they threw it out on that basis.

23        But the lesson of that case is that a Rule 15

24 deposition is the way you go overseas, witnesses

25 beyond --

1              THE COURT:  If they don't come.

2              MR. TAYLOR:  If they don't come.  And what

3    Johnson said is -- that's another precise point.

4              If you had done that Rule 15 subpoena

5    deposition thing, you would know at that time that you

6    have got a situation and then you would have time to

7    remedy it.

8              If you wait until you get to trial -- now,

9    wait a minute, I misspoke.

10             Johnson was the recalcitrant witness who

11   didn't want to -- he didn't want to testify.  He

12   wasn't overseas.

13             What they said in Johnson was if he continues

14   to refuse and you wait until trial and he refuses to

15   testify, then you have either got a mistrial or you

16   have got an acquittal because you didn't get the

17   evidence.

18             But if you take a Rule 15 deposition before

19   trial and he refuses to testify, then you can use the

20   contempt proceedings to try to coerce the testimony.

21             So you have -- you have forced the issue

22   early and you have time to react.

23             That's what we want to do here, we want to

24   force the issue early so we have time to react if he

25   doesn't come.

1           THE COURT:  I am a little -- I personally
2  think that if a guy is going to get up and say, "These
3  people are lying," he not only needs to say it in
4  front of these people that he has accused of lying,
5  but he also needs to say it to the people that he
6  wants to believe that these people are lying; in other
7  words, the jury.
8           Right now, we have a situation where
9  Mr. Chase says he is coming.
10          He is coming to trial even though he is not
11 subpoenaed -- or he is beyond the subpoena power.
12          If he says he is coming, then he is coming.
13 If he doesn't show up for trial, Mr. Romines said,
14 "You can grant a continuance."
15          Well, yeah, you can grant a continuance, but
16 there is the Speedy Trial Act.
17          Is that the prosecution's fault?  Whose fault
18 is it that he doesn't come?
19          It's Mr. Chase's fault, but who bears the
20 burden of that?
21          Is it the government whose case is dismissed
22 because they didn't have a deposition under Rule 15?
23          Or is it the defendant whose speedy trial
24 rights are, you know, necessarily impacted?
25          Defendants' counsel, having said that, "We

1   would go for -- we wouldn't object to a continuance,"

2   indicates to me that they would waive those rights.

3          And I don't see Mr. Renn saying, "No, we

4   didn't waive any rights," or Mr. Murphy saying, "No,

5   we didn't waive any rights."

6          But that would be my belief if they say, "We

7   object to taking this deposition early because he

8   could show up just like he's promised to do."

9          MR. TAYLOR:  But I must say, Your Honor, if

10  that happens and we take a recess it would be to go --

11         THE COURT:  No recess.  Well, I mean, we

12  would take a recess.

13         MR. TAYLOR:  It would be to do the MLAT

14  procedure and to go down there and have face to face

15  and read the deposition, and it won't be in front of a

16  jury like a videotaped deposition in the United States

17  would be.

18         THE COURT:  Well, but I am not for sure

19  that -- videotaped deposition would not -- is not --

20  that doesn't happen.

21         This is what the Sixth Circuit said in

22  Johnson.

23         Videotaped deposition or a video feed is not

24  the same thing as looking a guy right straight in the

25  eye by the jury and -- and weighing his credibility

1  with all the things that the jury is told to weigh in

2  making that decision.

3          Now, until I see that he is not inclined to

4  come, even though he is out -- having agreed to come,

5  according to your -- what you have said he's agreed to

6  do, come to the United States to give his deposition

7  and to testify at trial, until there is some reason

8  for me to believe that that's not true, then I see no

9  need to take his deposition, either here or in the

10 Bahamas.

11         Now, when it comes time, and if he takes like

12 -- if he backs out, takes -- what is it the term Judge

13 Moynahan used to take, take back water?

14         MR. MURPHY:  Lake bail.

15         THE COURT:  No, not lake bail, he is not on

16 bail.  Back water, I think.

17         If he takes back water, then you come in and

18 say, "Judge, we want to invoke Rule 15."

19         And that would be hard to say that you

20 wouldn't be entitled to it.

21         You have tried to get it.  There has been an

22 objection to taking it because he said he would come.

23         When he says he can't come, then Ramos says

24 that's when you take the -- the deposition.  Isn't

25 that what Ramos says?

1           MR. TAYLOR:  No, Ramos says you do it now in
2  case he changes his mind.  Then you have got a
3  deposition and --
4           THE COURT:  Well, I don't know about that.  I
5  don't recall that being the way you read it.
6           MR. TAYLOR:  It says, under -- they quoted
7  another case, Drogoul -- "a substantial likelihood of
8  unavailability can be found when the proposed deponent
9  is beyond the subpoena powers of the United States and
10 has declared his willingness to testify at trial, or
11 even having declared willingness to testify cannot be
12 subpoenaed if he changes his mind."
13          THE COURT:  Well, if he changes his mind.
14          MR. TAYLOR:  Right, and what Ramos says is
15 that is a -- the prospect of changing his mind is on
16 availability.
17          THE COURT:  Well, you tell me -- you show me
18 when he changes his mind and he is not willing to come
19 before trial, and I'll get you your deposition.  Or
20 I'll tell you to do the MLAT thing.
21          MR. TAYLOR:  And if he changes his mind
22 during the trial, what is my option at that point?
23          THE COURT:  Your option is you better make
24 sure your witness isn't going to change his mind.
25          MR. ROMINES:  Get more trustworthy witnesses.

1          THE COURT:  Well, that's a reasonable

2 possibility.

3          But you know, he might think he is

4 trustworthy.

5          MR. ROMINES:  If he doesn't trust him to get

6 on an airplane, Judge, I don't know how we can -- when

7 he says he is going to, I don't know how we can be

8 sending people to the penitentiary on his word, but

9 nonetheless --

10          MR. TAYLOR:  This is your clients in court.

11          THE COURT:  Well, I mean, you know, I mean,

12 everybody's got their own version of what's happening.

13          MR. ROMINES:  Exactly.

14          THE COURT:  So -- so I am not inclined to

15 grant the motion to take the deposition.

16          In fact, I am not going to do it until I am

17 told that he is not coming or that we have reason to

18 believe he is not coming.

19          He didn't -- he doesn't have an airplane

20 ticket.

21          He said, "I am not coming."  Then we will

22 have -- then we will have -- then we will have an

23 expedited deposition down in the Bahamas and nobody

24 can complain then.

25          MR. TAYLOR:  If we start MLAT again in

1  September, we are probably looking at nine months to

2  get it done.

3          THE COURT:  Well, you have got it started

4  now, shouldn't have to -- all you have to do is update

5  it.

6          So I don't want to see anybody testify by

7  deposition at a trial where people's liberty is at

8  stake without some hard fact that this witness is not

9  coming.

10          Part of a trial by jury is that the jury gets

11  to assess the credibility of the accusers, to weigh

12  the testimony and determine whether that testimony is

13  credible or not.

14          It's -- we repeat that throughout our

15  instructions.

16          I don't know how else we can -- I don't know

17  -- I mean, if you are not going to pay attention to it

18  before trial, then how can you give the instruction

19  after trial?  It's hard.  So that motion is denied.

20          Now, I believe we have had a -- what's the

21  matter, Mr. Murphy?

22          MR. MURPHY:  My back's killing me, otherwise

23  I am fine.  I was starting to get up.

24          THE COURT:  Why don't you just stand up?

25          MR. MURPHY:  That would be better, if I

1  could.

2          THE COURT:  Well, if that relieves your

3  back.

4          Now, we have a superseding indictment that we

5  have yet to arraign the defendants on, I believe; is

6  that correct?

7          MR. ROMINES:  Yes, sir, Your Honor.

8          THE COURT:  And they are here?

9          MR. ROMINES:  They are present, Your Honor.

10  Stand up.

11          THE COURT:  And you -- you have talked to

12  Mr. Coffman?

13          MR. ROMINES:  Your Honor, we have received

14  the indictment as well as the attached penalty page.

15          We have reviewed it, would waive formal

16  reading of the indictment, enter a plea of not guilty.

17          THE COURT:  All right, Mr. Renn?

18          MR. RENN:  Your Honor, the same for Miss

19  Coffman.

20          We, too, have received a copy of the

21  indictment.

22          We have reviewed it together, we have

23  discussed her constitutional rights, the penalties

24  involved; and we would waive those formalities at this

25  time, enter a plea of not guilty to all charges.

1              THE COURT:  All right, Mr. Murphy?

2              MR. MURPHY:  Likewise, for entering not

3    guilty, Your Honor.

4              We have gone over it, have discussed it in

5    detail and the penalties and would waive the formality

6    of the indictment reading.

7              THE COURT:  All right, let pleas of not

8    guilty be entered to the superseding indictment on

9    behalf of Mr. Bryan Coffman, counts 1 through 34 and

10   forfeiture count; Megan Coffman, 1 through 33 and

11   forfeiture; and Mr. Milby, counts 1 through 19 and 33

12   plus the forfeiture.

13             Now -- you all may be seated.  Now, we have

14   Mr. Tsatskin?

15             MR. TAYLOR:  Tsatskin, yes.

16             THE COURT:  Tsatskin?

17             MR. TAYLOR:  Victor Tsatskin.

18             THE COURT:  Where -- as they say, where be

19   he?

20             MR. TAYLOR:  Well, we are in contact with an

21   attorney for him.  He --

22             THE COURT:  He not be here.

23             MR. TAYLOR:  We have started -- I say

24   started, we have started extradition on the United

25   States's side of Canada.  That's what I am talking

1  about.

2           These things take forever, and that

3  application is sitting on somebody's desk in

4  Washington.

5           We are trying to get them to go ahead and

6  file in Canada.

7           He wants to cooperate, but he doesn't want to

8  consent to extradition.

9           He wants a deal before he steps across the

10 border.

11          Recently we have learned that his attorney --

12 we were going to meet the 24th, I think, Thursday, and

13 discuss this.

14          But his attorney has indicated that he's got

15 a broken wrist and supposedly can't travel for six

16 weeks.  So --

17          THE COURT:  What's he fly with his wings or

18 what?

19          MR. TAYLOR:  I don't know, these are all

20 these issues I am having with internationals.

21          THE COURT:  The attorney has a broken wrist.

22          MR. TAYLOR:  Yeah.  That's what he said.  He

23 told the other attorney who told me.

24          I haven't talked to him directly so -- it

25 must have been a heck of a broken wrist, but in any

1  event --

2          THE COURT:  Well, he is not flying like a

3  goose.

4          Airplanes can get him down here without too

5  big of a problem.

6          MR. TAYLOR:  That was kind of my thought, but

7  in any event, we are kind of at his mercy now.

8          So we are going to continue with extradition,

9  but if he fights it, we are talking another year.

10          THE COURT:  Well, what's that do to your

11  trial?

12          MR. TAYLOR:  We try them, then we try him.

13          THE COURT:  Okay.

14          MR. TAYLOR:  Just have to go try them.  But I

15  suspect --

16          THE COURT:  You are willing to do that?  You

17  are not going to claim that you can't go to trial,

18  can't duplicate trials?

19          MR. TAYLOR:  No.  No.  We can do that.  I

20  suspect that as we get closer to the trial he will

21  work something out with us and be available as a

22  witness.

23          THE COURT:  Okay.  Now, there is a couple

24  other motions, a release of lis pendens on -- by the

25  Coffmans?

1          MR. ROMINES:  Yes, Your Honor, that was filed

2 today.

3          THE COURT:  Yes, sir.

4          MR. ROMINES:  Judge, I am -- I wasn't quite

5 prepared to argue that today, but I will if the court

6 wants me to.

7          I was going to file a surreply and just let

8 it stand on the pleadings.

9          THE COURT:  You know, I am looking in the

10 rules, and I have been looking all over those rules,

11 and I didn't see anything that says anything about a

12 surreply.

13          MR. ROMINES:  That's why you have to ask for

14 permission first, Judge, I think.

15          THE COURT:  Well, if they wanted you to have

16 a surreply, why would they -- why wouldn't they put

17 that in the rule?

18          MR. ROMINES:  Well, Your Honor, I don't like

19 for my kids to always try to have the last word, but

20 they get it in anyway, that's kind of --

21          THE COURT:  Well, but you know what?  This

22 ain't you, and this ain't your kids.  This is -- what

23 do they call that?

24          MR. ROMINES:  That's exactly right, Judge,

25 and I have to listen a lot more when you talk than I

1  do when I talk, so but --

2          THE COURT:  Well, they probably don't listen

3  either.

4          MR. ROMINES:  Well, I do.  But if the court

5  would prefer that we no longer need to ask permission

6  to file them, I will file them.

7          THE COURT:  Well, as long as there is

8  something new.

9          MR. ROMINES:  Exactly.

10          THE COURT:  It's got to be something new that

11  came out in the response.

12          MR. ROMINES:  Well, and I think in these

13  issues that we have addressed today there has been,

14  Judge.

15          The primary issue that I would point out to

16  the government's reply regarding lis pendens is there

17  is no -- no authority that allows them to place lis

18  pendens on substitute assets while the case is

19  pending.

20          And the Sixth Circuit explicitly does not

21  allow it.

22          And all of these properties were owned by

23  Miss Coffman or Bryan Coffman prior to the dates of

24  the indictment.

25          Before any of these, you know, oil well

1 business or anything else ever started, they had owned

2 these properties, some for as long as ten years

3 prior.

4        It's -- based on the law, based on the facts

5 as you look at it in those cases, those are completely

6 inappropriate and unlawful.

7        And the Sixth Circuit has ruled as such, and

8 almost nearly every circuit has as well.

9        THE COURT:  Okay, Mr. Renn?

10        MR. RENN:  Your Honor, Mr. Romines did file

11 this motion on behalf of both of us.

12        I think it sets forth the correct law of this

13 circuit, and I would stand on the motion.

14        It was initially filed, it cites specifically

15 United States v. Parrot, 530 F. 3d, 422, Sixth Circuit

16 2008.

17        And again in that case there, the government

18 had filed a notice of lis pendens on properties

19 thereby identified as substitute assets.

20        And in that case, the government's notice

21 were on properties were filed that were owned by

22 defendant.

23        When the court came down and took a look at

24 what the law was in this circuit and other circuits,

25 basically concluded that there is no basis to encumber

1  in any way or place a lien on the substitute assets.

2          And then also this motion goes in and takes a

3  look at Kentucky law.

4          And Kentucky law doesn't provide for anything

5  like that either, citing a divorce case, Green v.

6  McFarland, 43 Southwest 3d, 258.

7          In that case, similarly they said that there

8  is no provision for the courts to go in and to

9  basically put a lien on somebody's property that isn't

10 before the court.

11         And that's basically what we have here.

12 Mr. Romines said they were assets that were owned by

13 the Coffmans well before the indictment period in this

14 case.

15         THE COURT:  You don't have a dog in that

16 fight, do you, Mr. Murphy?

17         MR. MURPHY:  No, but I have got another fight

18 that I am going to involve you in this afternoon with

19 my dog who is ready to go in that argument.  Does that

20 make sense?

21         THE COURT:  Not a bit.  But I was getting

22 ready to ask Mr. Romines something.

23         MR. ROMINES:  Yes, sir.

24         THE COURT:  Why do you need to file a

25 surreply?

1          MR. ROMINES:  I don't.  Just -- what I was
2  just going to say, Judge, I want to put it in writing.
3          THE COURT:  Because it's your motion, you
4  have the right to file --
5          MR. ROMINES:  A response.
6          MR. RENN:  A reply, that's correct.
7          THE COURT:  No, you filed a motion,
8  Mr. Taylor filed a response, then you get to file a
9  reply.
10          MR. ROMINES:  That's what I was wanting to
11  file, Judge, that.
12          But I don't need to now, I have already said
13  all I need to say.
14          But I can put it in writing if the court
15  prefers.
16          THE COURT:  No, that's fine.
17          Mr. Taylor?
18          MR. TAYLOR:  Actually, I am going to let --
19          THE COURT:  Miss Lewis?
20          MS. LEWIS:  Thank you, Your Honor.  Actually
21  the United States would take the position that the
22  actual case, the United States v. Parrot cited by the
23  Coffmans actually says explicitly, "We conclude that
24  the federal government may file a notice of lis
25  pendens against substitute assets prior to the entry

1  of a forfeiture order as long as it has fulfilled the

2  relevant state law requirements."

3          I think what's at issue here is whether the

4  federal criminal forfeiture statute permits the

5  government to do it, and the Coffmans are correct that

6  the Sixth Circuit doesn't allow that.

7          But if Kentucky law permits such a filing,

8  then the government may do it.

9          And under Kentucky law here, KRS Section

10  382.440 allows the filing of a lis pendens where the

11  title to or possession or use of any real property is

12  at issue.

13          And the government clearly has an interest in

14  these substitute assets.

15          There is no question that there is issue as

16  to whether those assets will be available to a third

17  party who is perhaps considering purchasing that

18  property, which is the whole point of filing the

19  notice of the lis pendens in the first place.

20          So by filing that notice, all the government

21  is simply doing is placing potential unknown third

22  parties on notice that there may be a problem with

23  those assets.

24          There is no restraint, there is no

25  inappropriate filing on behalf of the government here,

1 particularly under the case even cited by the

2 Coffmans.

3          THE COURT:  But Mr. Romines told me that this

4 is not permitted by Kentucky law.

5          MS. LEWIS:  Well, we --

6          THE COURT:  Now, don't point at Mr. Renn.

7          MR. ROMINES:  It's in the brief, Your Honor.

8          THE COURT:  Well, you wrote the brief.

9          MR. ROMINES:  Well, I understand, but I

10 haven't read it in awhile.  I have read through these

11 others today, Judge.

12          THE COURT:  Are you trying to say you didn't

13 read the brief that you signed and filed?

14          MR. ROMINES:  I wrote it, Your Honor, but --

15          THE COURT:  And you wrote it?

16          MR. ROMINES:  I didn't review it before I

17 came in here today.

18          Nonetheless, as counsel says, the Sixth

19 Circuit does not allow it in the United States

20 District Court; and that is where we stand today.

21          THE COURT:  That's what Miss Lewis says,

22 unless state law permits it.

23          MR. ROMINES:  It does not permit it, Judge,

24 even in this case.

25          THE COURT:  She is wrong, then, you are

1  saying.

2         MR. ROMINES:  I -- that would be my

3  contention.

4         THE COURT:  Okay.  Well, I am going to look

5  at both of these.

6         Now, Mr. Murphy -- we will take that one

7  under advisement.

8         MS. LEWIS:  Thank you, Your Honor.

9         THE COURT:  Do you have something,

10 Mr. Murphy, that your dog is wanting to get into a

11 fight about?

12        MR. MURPHY:  Absolutely, Your Honor.

13        THE COURT:  Do you have a motion filed?

14        MR. MURPHY:  I am reluctant to file a motion

15 that's already been granted for the same thing.

16        THE COURT:  Can't you file a motion to seek

17 enforcement of an order that's been granted?

18        MR. MURPHY:  I could, Your Honor, but this is

19 -- I really need some suggestions possibly from you.

20        THE COURT:  Okay.

21        MR. MURPHY:  I feel like I am a competent

22 attorney, but I don't know -- I think I know what's

23 going on here.

24        And I think we have got some individuals,

25 one, a court appointed receiver and two attorneys in

1 Tennessee that are playing cutesy --

2          THE COURT:  That's in Tennessee, right?

3          MR. MURPHY:  -- with your rules.

4          THE COURT:  With my rules?

5          MR. MURPHY:  Yes, when I left court here in

6 February, February the 12th, I thought you wanted

7 those people in Tennessee to give my client back his

8 personal papers and the hard drives to his computer

9 which they should not have ever had access to.

10          The order was entered, and it says that,

11 "Counsel for the United States" -- and that would be

12 Ken Taylor --

13          THE COURT:  Or Christy Lewis, as the case may

14 be.

15          MR. MURPHY:  Or Hydie Baker.  There is three

16 now.  Three official attorneys in the case; is that

17 right?

18          MS. LEWIS:  Yes.

19          MR. MURPHY:  Which concerns my client that it

20 is now three against one so --

21          THE COURT:  One competent.

22          MR. MURPHY:  That's what I have told him, at

23 least so I thought.

24          THE COURT:  Yeah.

25          MR. ROMINES:  Out of the six or out of the

1 three, Judge?  Because I like the odds better if it's

2 just out of the three.

3          MR. MURPHY:  "Counsel for the United States

4 is directed to contact Joseph Woodruff of Waller,

5 Landsden, Dortch & Davis in Nashville, Tennessee and

6 have James Skinner, court appointed receiver in the

7 Middle District of Tennessee, National Division, case

8 number whatever, return every document and every hard

9 drive seized from the defendant, Gary Milby, to

10 counsel for the defendant Milby."

11          I have not received an email, memo, no

12 letter, phone call; and I certainly have not received

13 any documents or hard drives.

14          THE COURT:  Have you broached that matter

15 with Mr. Taylor?

16          MR. MURPHY:  Mr. Taylor says that as far as

17 he is concerned, and with all due respect, that he has

18 fulfilled his obligation under that order.

19          And to me, that's hair-splitting, and I

20 thought you meant that you wanted those people and

21 that you ordered those people to return that stuff to

22 my client.

23          Now, they haven't done that, but you were

24 right about Judge Russell.

25          Danny Butler, an attorney in Greensburg,

1 Kentucky, filed a motion on behalf of Gary Milby's

2 brother.

3          They go in front of the court, they tell the

4 court what has happened.

5          Judge Russell is outraged, and he orders them

6 to return everything that they took because they had

7 absolutely no authority.

8          THE COURT:  The Tennessee people?

9          MR. MURPHY:  They took -- yeah, and they

10 returned everything.

11          They even took a lockbox that belonged to my

12 client that had like a birth certificate and a couple

13 other obviously personal papers.

14          They gave that to his attorneys in Tennessee

15 in the public defender's office.

16          But they have still got three bankers boxes

17 full of all of his business records and business

18 dealings with --

19          THE COURT:  Your client?

20          MR. MURPHY:  My client's.  And Mr. Taylor did

21 say one thing that -- and I didn't think about it at

22 the time, but it disturbed me because in another

23 conversation, maybe a month and a half, two months

24 ago, he told me that Mr. Skinner was taking the

25 position that the documents belonged to him because

1 they pertained to Mid-America which in fact

2 Mr. Skinner has become as receiver.

3          But it's preventing me from going over all

4 the records that my client kept in all of his

5 dealings, selling all of these units, things that

6 would help him refresh his memory, his recollection of

7 the events that happened with this particular buyer or

8 that particular buyer.

9          And there is no reason that -- that they can

10 say they are not his records.

11          They are his records, and I know that the

12 assistant U.S. attorney is in it with them, so to

13 speak, Mr. Ty Howard, because -- and I asked him,

14 "When is the last time you ever saw an AUSA file a

15 trial subpoena for something eight months ahead of the

16 trial date?"

17          Eight months.  I have never seen it happen in

18 my life.

19          But yet, I am sure after Mr. Skinner and

20 Mr. Woodruff, or both, advised the AUSA down there

21 what Ken Taylor has told them about your order, he

22 issues a subpoena for the computers.

23          THE COURT:  That's marvelous, you know?

24          MR. MURPHY:  Which they still have the hard

25 drives.

```
 1            THE COURT:  I am not even going to look at
 2  Mr. Taylor and tell Mr. Taylor that I want all this
 3  stuff here.
 4            MR. MURPHY:  I understand that because Ken
 5  Taylor --
 6            THE COURT:  I am not going to tell Mr. Taylor
 7  that I want all this stuff here.
 8            But he better call his friendly associate
 9  counsel down in Tennessee and tell him that if his
10  associate counsel doesn't want to show up here with
11  all those things, then he better turn them over to
12  you.
13            MR. MURPHY:  Well, there is even more to this
14  than just that.  That's just the initial --
15            THE COURT:  You think Judge Russell can get
16  upset?  I can get upset worse than Judge Russell.
17            MR. MURPHY:  Well, I thought that that's what
18  you wanted when we were here last time.
19            But apparently they are splitting hairs down
20  there.
21            THE COURT:  Well, we don't split hairs
22  obviously with anything that has to do with me.
23            MR. MURPHY:  Or they are totally ignoring
24  what they believe is your authority over them which
25  they apparently believe is none.
```

```
 1            THE COURT:  Well, if the property belongs to
 2   Mr. Milby, I have got Mr. Milby.
 3            And if it's his property, they have got to
 4   turn it over.
 5            MR. MURPHY:  Well, there is even more --
 6   what's more disturbing to me, Your Honor, is mixed in
 7   amongst all of those documents are privileged, legal
 8   communications that he has had with not one but with
 9   seven different attorneys who have represented him at
10   one time or another either in civil litigation in
11   Kentucky, civil litigation in Tennessee, an SEC
12   investigation.
13            There is a lot -- and also there are letters
14   from --
15            THE COURT:  No, you don't have to get me any
16   more upset, Mr. Murphy, I am upset now.
17            MR. MURPHY:  Well, I think it has -- it's put
18   a taint on this case here because the Department of
19   Justice has a lot of information that they have
20   absolutely no right to ever come in possession of.
21            There is a lot of correspondence involving
22   the SEC investigation between the attorney Hunter
23   Durham and my client.
24            And they have all of that, and lo and behold,
25   what do we get now, we get a new indictment and we got
```

1 SEC charges.

2          So I think that at least the people in

3 Tennessee need to be put before the court under oath

4 and let them explain why they won't give the stuff

5 back, let them explain whether what they have got with

6 no particular reason --

7          THE COURT:  Mr. Taylor --

8          MR. MURPHY:  -- has tainted this case.

9          THE COURT:  Mr. Taylor -- may I see your

10 book, Madam Clerk?

11          I think I have got a good afternoon on

12 Thursday, don't I, Madam Clerk?

13          THE CLERK:  Yes, Your Honor.

14          THE COURT:  Don't I have a fairly clear

15 afternoon Thursday?

16          THE CLERK:  Yes, Your Honor.

17          THE COURT:  You have your fellow from

18 Tennessee up here on Thursday.

19          MR. MURPHY:  Judge, I'm sorry, I have a

20 sentencing in front of Judge Van Tatenhove.

21          THE COURT:  Well, Van Tatenhove -- Judge Van

22 Tatenhove will have to wait on the sentence.

23          MR. TAYLOR:  May I weigh in on some of this?

24          THE COURT:  No, I told you to tell your

25 Tennessee people that they were to give the documents

1  that they took from him back.

2          MR. TAYLOR:  Judge --

3          THE COURT:  How clear is that?

4          MR. TAYLOR:  Judge, I have no authority to

5  order them to do anything.

6          THE COURT:  No, I do.  You don't have to do

7  anything, but I told you to tell them what I said.

8          MR. TAYLOR:  And I did.

9          THE COURT:  Then I am bringing the Tennessee

10 guy here Thursday afternoon.

11         MR. TAYLOR:  Let me say --

12         THE COURT:  No.

13         MR. TAYLOR:  -- something to this --

14         THE COURT:  No, listen to me.  They have

15 taken papers that belong to him.

16         MR. TAYLOR:  Says he.

17         THE COURT:  Well, what was the subpoena that

18 they are -- they are wanting --

19         MR. TAYLOR:  This is all one-sided, Judge,

20 that's my point.  There is two sides to this.

21         THE COURT:  Really?

22         MR. TAYLOR:  Yes.

23         THE COURT:  Well, the two sides are they must

24 have taken papers from him because they are now trying

25 to subpoena those papers to keep them in the court.

```
 1            MR. MURPHY:  It's the -- it's the computers.
 2            THE COURT:  The computers.
 3            MR. MURPHY:  Which include the hard drives.
 4            THE COURT:  Hard drives, yeah.  They took
 5  hard drives, Skinner's wanting to say that they are
 6  his papers.
 7            MR. TAYLOR:  On the basis of what are we
 8  making these representations?
 9            THE COURT:  Well, I would like to have the
10  Tennessee guy come up here and explain that to me
11  Thursday afternoon at 1:30.
12            MR. TAYLOR:  I cannot order him here, Judge.
13  You are going to have to order him here.
14            THE COURT:  Okay, then I'll tell you how I'll
15  order him here.
16            If I don't have him here, and it's not
17  satisfactorily explained to me why these papers have
18  not been turned over, pursuant to my order, I'll find
19  that you don't have a case against Mr. Milby.  Now,
20  does that give you some impetus?
21            MR. TAYLOR:  Well, I mean, I --
22            THE COURT:  I think it's prosecutorial
23  misconduct down there if they have got papers -- if
24  they have got papers that involve attorney-client
25  communications, and they are -- and they are holding
```

1 onto them, there is prosecutorial misconduct there.

2          MR. TAYLOR:  Your Honor, we shouldn't make

3 these decisions based on ex parte communications with

4 the court.

5          The other side needs to have their say, and

6 they need -- he needs to make a charge, and we need to

7 make a reply.

8          THE COURT:  Well, that's what I want to have

9 -- that's why -- he asked for those months ago,

10 Mr. Taylor, February 12th.

11          MR. TAYLOR:  And let me say this --

12          THE COURT:  And February -- don't argue with

13 me.

14          February 12th he asked for those.  It is May

15 24th.

16          MR. TAYLOR:  And this --

17          THE COURT:  That looks to me like better than

18 two months.

19          MR. TAYLOR:  I communicated --

20          THE COURT:  Oh, maybe three months.

21          MR. TAYLOR:  I communicated that to

22 Mr. Woodruff.

23          And I said -- I gave Mr. Murphy his phone

24 call -- his phone number, and I said, "Well, you two

25 coordinate this," and he has not called them yet.

1          THE COURT:  Well, I told you to.

2          MR. TAYLOR:  I did, and I sent him the order.

3          THE COURT:  Well, then you need to get with

4   Mr. Woodruff and Mr. Murphy and get this taken care

5   of, Mr. Taylor, because 1:30 Thursday I want to hear

6   him explain why they haven't produced those documents

7   and those hard drives and those attorney-client

8   privilege letters.

9          Those attorney-client privilege letters,

10  Mr. Taylor --

11         MR. TAYLOR:  Can I move the court then for an

12  order directing them to be here?  Because I don't want

13  to be in a position of ordering --

14         THE COURT:  You are not ordering anything.  I

15  have ordered him to be here at 1:30 Thursday afternoon

16  to explain why Mr. Taylor -- why Mr. Taylor's request

17  that he provide Mr. Murphy with -- pursuant to my

18  directive with his material, his client's material has

19  not been complied with.

20         MR. TAYLOR:  Okay, now, when you say "he,"

21  who are we referring to precisely?

22         MR. MURPHY:  Mr. Skinner.

23         MR. TAYLOR:  Mr. Skinner.

24         THE COURT:  And Mr. Woodruff, who is the U.S.

25  attorney.

```
 1           MR. TAYLOR:  No.

 2           THE COURT:  Whoever the U.S. attorney is.

 3           MR. MURPHY:  Ty Howard.

 4           THE COURT:  Ty Howard.  And who is

 5  Mr. Woodruff?

 6           MR. MURPHY:  He is the attorney that's

 7  involved in the civil litigation against Mr. Milby and

 8  his brother.  But he is the one that -- Mr. Skinner --

 9           THE COURT:  The -- the documents were taken

10  by whom?

11           MR. MURPHY:  Mr. Skinner who -- who, without

12  authority, used a writ from Judge Russell to take

13  them.

14           THE COURT:  Who has said -- who has said,

15  "Bring these documents back," right?

16           MR. MURPHY:  He ordered them to return the

17  property.

18           I have not seen that -- I don't know if he

19  said, "Bring those documents back."

20           I thought he said, "Bring everything back

21  that you took."  I would have to get that order.

22           THE COURT:  Well, better have that -- you

23  have that order.

24           You better have Mr. Skinner, and you better

25  tell Mr. Howard that we are having a hearing here
```

1 Thursday.

2       And this could impact your case very severely

3 against Mr. Milby.

4       MR. TAYLOR:  Well, Your Honor, it hasn't

5 tainted anything that I have got, so --

6       THE COURT:  I don't care.  But there has been

7 charges brought, indictment has been brought, after --

8 after I -- the SEC charges, when were they brought,

9 Mr. Murphy?

10      MR. MURPHY:  Part of the superseding

11 indictment.

12      MR. TAYLOR:  It's not any new evidence.

13      MR. MURPHY:  Three months.  I am just saying,

14 the timing is -- you know, I look at it, my client

15 looks at it; it's suspicious.

16      Maybe these people from Tennessee need to

17 tell us under oath whether there has been any

18 collusion or whether they have let the taint spill

19 over into this case here to protect Mr. Taylor.

20      THE COURT:  Well, I just think we are going

21 to have a little hearing here on -- unless you get

22 this worked out, Mr. Taylor.

23      Don't look like -- don't look at me like, "I

24 can't do this."

25      All you have got to do is call down there and

1  say, "Listen, I am going to lose this case if you

2  don't do what the judge says."

3          They can make copies of all these things,

4  except the -- except the attorney-client privilege

5  letters.

6          They can't make copies of those.  They don't

7  have any right to them.

8          MR. MURPHY:  And they should never have had

9  access to them --

10          THE COURT:  They should never have had access

11  to them either.

12          MR. MURPHY:  To the hard drives.

13          MR. TAYLOR:  And if we are making these

14  conclusions that there is attorney-client violations

15  when I don't know that there is.

16          THE COURT:  I don't know if there is, but if

17  they have got a letter that says attorney-client

18  privilege, then there is a distinct possibility that

19  there might be.

20          And they don't have any right to those in the

21  first place, whether there is something tainted about

22  it or not.

23          MR. MURPHY:  There is a correspondence

24  between my client and --

25          MR. ROMINES:  And his attorney, Mr. Coffman,

1 Your Honor.

2          MR. MURPHY:  Mr. Coffman and Mr. Coffman's

3 attorney, and Mrs. Coffman's attorney and a lady by

4 the name of Leila O'Carra.

5          MR. ROMINES:  And Your Honor --

6          THE COURT:  Leila.

7          MR. ROMINES:  -- while Mr. Coffman was

8 representing Mr. Milby, there was attorney-client

9 correspondence between the two of them that they have

10 possession on according to Mr. Murphy so --

11          MR. MURPHY:  Well, and that's why I think

12 that Ty Howard wants the hard drives from the computer

13 because they have already looked at them and found

14 something that incriminates my client.  He is facing

15 similar charges in Tennessee.

16          THE COURT:  I want to have Mr. Howard here,

17 Mr. Skinner here; and that's an order going out.

18          If we have to send the subpoena down there

19 with the Marshal, then we will do that.

20          But I think, Mr. Taylor, that you ought to be

21 able to talk to your colleague down in Tennessee and

22 say, "Why are they holding on to all of this

23 material?"

24          MR. TAYLOR:  Your Honor, may I ask that the

25 court direct that Mr. Murphy and anybody else that

1  wants to participate go back to my office and get

2  these people on the phone?

3           Because I think we are going to find there is

4  another side of this story.

5           I don't think you are getting correct

6  information here.

7           And so I would like to go directly there and

8  try to get these people on the phone.

9           THE COURT:  You and Mr. Murphy can do

10  whatever you want to do, Mr. Taylor.

11           I said Thursday afternoon at 1:30 we are

12  going to have a little question and answer series.

13           And I am going to do most of the questioning,

14  and we are going to get the answers.

15           I don't like the idea of people just -- you

16  know, I sent you down there as -- with a directive,

17  not a please, but return these.

18           And if I can't rely on a litigator here to

19  carry the message to tell them that that's an order

20  from me --

21           MR. TAYLOR:  Well, it wasn't an order to

22  them, it was an order to me.

23           THE COURT:  Actually, I believe it says they

24  are to return it, and you are to tell them that that

25  was the order.

1          MR. TAYLOR:  The order says that, "Mr. Taylor

2  is directed to tell them to do that."

3          THE COURT:  Do you want to parse words with

4  me?

5          You were ordered to do that.  They are -- you

6  were ordered to tell them that I have ordered them to

7  turn them over.

8          MR. TAYLOR:  And I did.

9          THE COURT:  And you can call back down there

10  this afternoon and tell them that I have ordered that

11  they be here Thursday afternoon at 1:30 or to figure

12  out a way to get that taken care of in that period of

13  time.

14          Now, let's get it straight so we don't have

15  any confusion.

16          I have ordered them to turn over -- to return

17  those matters to Mr. Milby's counsel.

18          I have directed you to contact them and tell

19  them that, that I have ordered them to do that.  Now,

20  are our roles straight here now?

21          MR. TAYLOR:  I will do that.  I will do that.

22          THE COURT:  And tell them there is an order

23  out that they shall be here, all right?

24          MR. TAYLOR:  All right.

25          THE COURT:  Now, if you and Mr. Taylor want

1 to go over there and talk to Mr. Howard and Mr. --

2          MR. MURPHY:  I am not sure that that's --
3 they can just say, "Well, the records don't exist," or
4 whatever.

5          They are not going to be under oath.  They
6 don't have to tell me the truth.

7          MR. TAYLOR:  You might find out you have been
8 fed some wrong information.

9          MR. MURPHY:  They might say they don't exist.

10          THE COURT:  But we will -- but we will find
11 out when they get here on Thursday whether they have
12 been or not.

13          MR. MURPHY:  And that will be our defense at
14 trial is that the government stole our documents that
15 we could have used to defend ourselves and therefore
16 we can't.

17          THE COURT:  I don't know if the government
18 stole them, but Mr. Skinner might have.

19          MR. MURPHY:  But you saw his mode of
20 operation is to continue to funnel information to the
21 Department of Justice.

22          THE COURT:  Well, I wouldn't -- that doesn't
23 surprise me at all but -- if he would do that.

24          But that's something we will learn on
25 Thursday.

1           MR. MURPHY:  Thank you, Your Honor, I

2  appreciate your assistance.

3           THE COURT:  Well, I just don't like when I --

4  I mean, when I say I want these documents -- how did

5  Judge Russell get these documents back?

6           MR. TAYLOR:  I don't know that he did.

7           MR. MURPHY:  He got the physical property,

8  personal property, machinery, furniture, things like

9  that that they took under the writ.

10          THE COURT:  Yeah.  How about the hard drives?

11          MR. MURPHY:  I don't know if he addressed

12 that, did he, Mr. Milby?

13          DEFENDANT MILBY:  Yes, sir.

14          MR. MURPHY:  I would have to see the order.

15 I would have to talk to Mr. Butler about that.

16          DEFENDANT MILBY:  They gave Judge Russell

17 those --

18          MR. MURPHY:  Two of those computers aren't

19 even Mr. Milby's.

20          One of them is his lady friend, and another

21 one is his brother's.

22          THE COURT:  Well, Thursday afternoon at 1:30,

23 we will kind of sort this out unless we have got it

24 worked out by then.

25          MR. MURPHY:  So that's still not -- we are

1  not going to be able to work out the part about the

2  appearance of the taint, the spillover of the

3  information from the Department of Justice with regard

4  to Mr. Milby's case.

5        THE COURT:  You don't know what information

6  they have, so you can't tell me what the spillover is,

7  right?

8        MR. MURPHY:  Well, I think once -- once

9  that --

10        THE COURT:  Once you get the information they

11  have in their possession --

12        MR. MURPHY:  Once that surfaces, then the

13  government actually has the obligation to show that

14  it's not tainted.

15        THE COURT:  Well, you can say what part of it

16  is tainted, in your belief what's tainted, and let

17  Mr. Taylor --

18        MR. MURPHY:  The new superseding charges.

19        THE COURT:  Huh?

20        MR. MURPHY:  The superseding charges

21  involving SEC violations.

22        MR. TAYLOR:  Those 10(b)(5) charges are just

23  another theory of prosecution.  The evidence is the

24  same.  There is no new evidence.

25        THE COURT:  We will see when we find out what

1 happened to the property of Mr. Milby.

2          MR. ROMINES:  Your Honor, does -- I have got

3 a conflict on Thursday, but I am going to try to get

4 it changed.

5          Do the defendants need to be present for

6 Thursday's hearing?

7          THE COURT:  I don't see that this makes --

8 that they -- the Coffmans have any dog in this

9 particular fight right now.

10          But it's Mr. Murphy's dog, as he said, that

11 is in the fight; so they don't need to be here.

12          MR. ROMINES:  That's fine, Your Honor.

13          THE COURT:  Okay?

14          MR. ROMINES:  Thank you.

15          THE COURT:  Being nothing further at this

16 time, court will be in recess until court in course.

17          (The further hearing in this matter was

18 concluded at 2:36 p.m.)

19                              - - -

20                        CERTIFICATE

21          I certify that the foregoing is a correct

22 transcript from the record of proceedings in the

23 above-entitled matter.

24 s/  K. Ann Banta_____          5-25-10_____
   K. Ann Banta, RPR, CRR          Date

25